UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

JOEL EARL BROWN, :

Plaintiff, :

-against- :

PARKCHESTER SOUTH CONDOMINIUMS, INC., :

Defendant.
--------------------------------------------------------x

**OPINION AND ORDER**

00 Civ. 7235 (FM)

**FRANK MAAS**, United States Magistrate Judge.

I. Introduction

Plaintiff Joel Brown ("Brown") brings this employment discrimination action against his former employer, Parkchester South Condominiums, Inc. ("Parkchester"), alleging that he was subjected to a hostile work environment and improperly terminated on the basis of his race, age, sex, and disability, in violation of federal law. Following the close of discovery, Parkchester has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Docket No. 56). For the reasons set forth below, Parkchester's motion for summary judgment is granted.

II. Facts

Although Parkchester has submitted the statement of undisputed facts required by Local Civil Rule 56.1, Brown has neither served nor filed the counter-statement contemplated by the rule. He has however, submitted extensive opposition

papers, including sworn statements and affidavits, which address many of the facts Parkchester relies upon in support of its motion. (Docket No. 59 (Pl.'s Defense Against Summary Judgment ("Pl.'s Opp'n")). I have treated Brown's papers as his Rule 56.1 counter-statement, but to the extent that those papers do not create factual issues or rely on inadmissible evidence, the facts set forth in Parkchester's Rule 56.1 Statement must be deemed admitted. See, e.g., Loucar v. Boston Market Corp., 294 F. Supp. 2d 472, 478 (S.D.N.Y. 2003) (plaintiff's "unsupported, conclusory statements and denials" cannot refute defendant's "properly-supported statements of material fact in its Rule 56.1 Statement"); Gadsen v. Jones Lang Lasalle Americas, Inc., 210 F. Supp. 2d 430, 438 (S.D.N.Y. 2002) ("Courts in this circuit have not hesitated to deem admitted the facts in a movant's Local Civil Rule 56.1 Statement that have not been controverted by a Local Civil Rule 56.1 statement from the nonmoving party."). The Court also must disregard allegations which are purely conclusory and devoid of concrete particulars. Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 2003).

Viewing the parties' submissions in this manner, I find that the following facts, unless otherwise indicated, are undisputed:

A. Brown's Employment at Parkchester

Brown is a 71-year old African American male. (See Pl.'s Opp'n Attach. (Resume for the Position of Locksmith)). He began his employment with Parkchester in 1976 or 1977 as a security guard and became a Special Patrol Officer ("SPO") between 1990 and 1992. (See Def.'s R. 56.1 Stmt. ¶ 2; Affirm. of Margaret M. Shalley, Esq.,

dated Feb. 14, 2005 ("Shalley Affirm."), Ex. A (Dep. of Joel Brown, taken on Oct. 15, 2004 ("Brown Dep.")), at 7-8). SPOs are licensed by the City of New York Police Department. (Def.'s R. 56.1 Stmt.

¶ 1). At Parkchester, the duties of an SPO include "vertical" tours of the building, i.e., "walking floor by floor down the stairs from the top floor;" patrolling the grounds; investigating criminal matters; chasing and subduing suspects; and making and aiding in arrests. (Aff. of Dennis Cowan ("Cowan"), sworn to on Jan. 26, 2005 ("Cowan Aff."), ¶ 6; Brown Dep. 8-9). During the course of his employment as a Parkchester SPO, Brown received several commendations for his performance. (Brown Dep. 11-12; Pl.'s Surreply Attachs.).[1] Nevertheless, Parkchester terminated Brown's employment on or about December 23, 1997. (Def.'s R. 56.1 Stmt. ¶ 3; Brown Dep. 65; Shalley Affirm. Ex. B). Parkchester contends that this dismissal was necessary because Brown failed to establish that he could perform his job despite his knee problems. (Cowan Aff. ¶ 5).

B. Brown's Injuries and Medical Leaves

Brown first injured his knees in or around 1978 while he was making an arrest. At that time, his doctor predicted that he would eventually develop arthritis, which, in fact, did occur some ten years later. (Brown. Dep. 12). In 1995, Brown underwent bilateral total knee replacements and was on medical leave for approximately

[1] By Order dated March 24, 2005, I allowed Brown to file supplemental papers in opposition to Parkchester's amended motion. (See Docket No. 58). Brown served such supplemental papers (hereinafter "Pl.'s Surreply") on April 18, 2005, but apparently did not file them with the Clerk of the Court. I have requested that those supplemental papers be docketed so that the record will be complete.

six months before resuming his work on December 4, 2005. (Id. at 13-14). When he returned, Brown submitted a letter from his physician stating that he was undergoing extensive physical therapy and could perform only "limited foot patrol and limited stairclimbing." (Id.; Shalley Affirm. Ex. C (Letter from Walter A. Besser, M.D., F.A.C.S. ("Dr. Besser"), dated Nov. 17, 1995)). Brown therefore was assigned to a "stationary post" which required that he patrol only the area surrounding his booth and the immediate parking area. (Brown Dep. 16).

In February 1996, Brown was called away from his fixed post to respond to a burglary in progress. (Id.). The prosthesis in Brown's right knee broke and was displaced when the suspect struck it with his elbow in the course of his arrest. (Id. at 21-22, 24). Despite this injury, Brown returned to work for some time. (Id. at 26).

On or about July 22, 1996, Brown underwent surgery to repair his right total knee replacement and expected to be out of work for six months. (Id. at 27-28; Cowan Aff. ¶ 9; Shalley Affirm. Ex. D (Letter from Dr. Besser dated June 25, 1996)). Thereafter, in December 1996, Brown requested that his medical leave be extended for an additional six months for therapy and rehabilitation. (Id. at 29-30; Shalley Affirm. Ex. E (Memo from Brown to Director of Security Cowan, dated Dec. 18, 1996)). In connection with that request, Dr. Arturo Pena ("Dr. Pena"), one of Brown's physicians, wrote a letter, which was submitted to Parkchester, stating that Brown was "totally disabled until further notice." (Def.'s R. 56.1 Stmt. ¶ 9; Shalley Affirm. Ex. I (Letter from Dr. Pena dated Dec.

17, 1996)). Brown's request for an extension was granted, extending his leave to June of 1997.[2] (Brown Dep. 30).

The Collective Bargaining Agreement ("CBA") between Parkchester and Local 39, International Guards Union of America ("Local 39"), of which Brown was a member, required an employee wishing to return to work from a medical leave of absence to submit proof of his physical and mental ability to do so. (Brown Dep. 33; Shalley Affirm. Ex. F (CBA), Article XXVIII). In June 1997, Brown submitted to Parkchester a letter from Dr. Besser which stated that Brown would be able to return to work on July 8, 1997, but would be able to perform only "light/limited duties." (Brown Dep. 32-33, 35; Shalley Affirm. Ex. G (Letter from Dr. Besser dated June 5, 1997)). By memorandum dated June 19, 1997, Cowan informed Brown that, given the nature of his duties as an SPO, he "must return able to perform full duty." (Shalley Affirm. Ex. H (Mem. from Cowan to Brown dated June 19, 1997)). Contrary to Parkchester's contention however, the Cowan memorandum did not request further clarification of the duties Brown was physically able to perform. (See id.; Def.'s R. 56.1 Stmt. ¶ 13). As a consequence, Brown may have been unaware that he was not medically cleared to return to work until

---

[2] Unbeknownst to Parkchester, Brown suffered a stroke some time in 1996. He also had additional strokes in 1998 and 1999. (Pl.'s Opp'n Physical and Mental Abuse, Part B ¶¶ 5-7).

he went to pick up his uniforms and was told that they were not ready.[3] (Brown Dep. 36-38).

C. Grievance Proceeding

After learning that he was not being permitted to return to work, Brown filed a grievance through his Union, which alleged that Parkchester's conduct constituted "a clear case of discrimination" on the basis of age, sex, and disability. (Def.'s R. 56.1 Stmt. ¶ 14; Brown Dep. 39; Shalley Affirm. Ex. L (Notice: Step #1 Grievance Charge)). In that filing, the Union further alleged that Parkchester had in the past made accommodations for other officers who wished to return to work after being injured on the job. (Id.). The Union completed the first three steps of the grievance process, which included several meetings between Union and management representatives, but then informed Brown that it lacked the funds needed to hire an attorney to arbitrate his claim. (Brown Dep. 40-41, 57).

During the grievance process, Parkchester also offered Brown a dispatcher position at the lower dispatcher rate of pay. (Cowan Aff. ¶ 13). However, the Union never relayed the details of that offer to Brown, telling him merely that Parkchester had refused to offer him a dispatcher position at his SPO salary. (Brown Dep. 60-62).

---

[3] Brown's unsworn opposition papers allege that he never received Cowan's memorandum, but he conceded during his deposition that he might have. (See Pl.'s Opp'n Preface (1) ¶ 14; Brown Dep. 36).

D. Rationale for Brown's Termination

In October 1997, while the grievance process was underway, Brown was advised that Parkchester wanted a note from his physician explaining specifically what the "light/limited duties" that he was requesting entailed. (Id. at 51, 62-63; Cowan Aff. ¶ 11). Brown never obtained such clarification because he did not have an appointment with Dr. Besser until January 1997. (Brown Dep. 63; Cowan Aff. ¶ 11). Nevertheless, on October 2, 1997, Dr. Besser wrote a "[t]o whom it may concern" letter, in which he stated that Brown had "a permanent disability of the right knee" and was "unable to climb stairs or walk more than one block." (Shalley Affirm. Ex. J). The letter further stated that Brown was "not able to work as a Special Policeman indefinitely" and that his condition constituted a "permanent disability" which was "progressive."[4] (Id.).

Ultimately, on December 23, 1997, Parkchester terminated Brown. Parkchester claims that Brown was terminated because he had not submitted the requested documentation showing that he could perform the duties of his job. (Cowan Aff. ¶ 12). The memorandum notifying the Union of Brown's termination also noted that he had been "out more than one year on compensation." (Shalley Affirm. Ex. K). The

[4] Brown contends that this letter was sent to the Worker's Compensation Board after Parkchester refused to accommodate him. (See Pl.'s Opp'n Preface (1) ¶ 16). Brown further contends in an unsworn (and therefore inadmissible) statement that a "Doctor Aghu gave [him] a clean bill of health and a doctor[']s note" which he presented to John Bellamy, the Deputy Chief of Security. However, Brown has produced neither the note nor a sworn statement from Dr. Aghu.

author of the memorandum was Cowan, himself a 66-year old African American. (Id.; Cowan Decl. ¶ 3).

E. EEOC Complaint

In November 1997, Brown filed a complaint with the federal Equal Employment Opportunity Commission ("EEOC") in which he advanced claims of age, race, and disability discrimination. (See Shalley Affirm. Ex. M). The EEOC subsequently issued Brown a right-to-sue letter on June 1, 2000. (Def.'s R. 56.1 Stmt. ¶ 19; Cert. of James F. Berg, Esq., in Supp't of Mot. to Dismiss, dated Apr. 17, 2001 (Docket No. 4), Ex. A)).

F. Brown's Claims

1. Disability Discrimination

In this suit, Brown alleges that Parkchester improperly refused to accommodate his disability by offering him a post similar to one that previously had been assigned to Salvatore Cuccinella ("Cuccinella"), an older, Caucasian SPO, who was unable to climb stairs or stand for very long. (See Pl.'s Opp'n Preface (2) ¶ 6). The post that Cuccinella was assigned was a permanent fixed post, which allowed him to sit in a booth and required only limited patrolling. (Brown Dep. 43-46; Pl.'s Opp'n Attach. (Stmt. of Leon Heyward, sworn to on Feb. 2, 2005)). Cuccinella was an SPO who had worked as a dispatcher for ten years on a weekday 8 a.m to 4 p.m. shift. (Aff. of John Bellamy, sworn to on Mar. 14, 2005 ("Bellamy Aff."), ¶ 6). As part of its effort to substitute lower-paid "civilians" for SPOs to work as dispatchers, Parkchester agreed with

the Union to keep Cuccinella's weekday schedule and assign him to the Metropolitan Oval Post when it relieved him of dispatcher duties. (Id. ¶ 7). Rather than retiring soon thereafter, as Parkchester evidently anticipated, Cuccinella apparently kept that fixed post for at least several years. (Pl.'s Opp'n Preface (2) ¶ 20).

2. Race Discrimination

Brown also cites the assignment of SPO Cuccinella to a fixed post as evidence of disparate treatment on the basis of race. (Pl.'s Opp'n Material Fact Sheet 1 (Racial Discrimination) ¶ 1). He further alleges that another Caucasian SPO was given a light duty position in the Parkchester training school as a reward for surreptitiously taping his fellow employees. (Id. ¶ 2). Finally, he alleges that he applied for a position as a locksmith which, instead, was given to another Caucasian relative of Parkchester's general manager, Vincent Occhipinti ("Occhipinti"). (Id. ¶ 3). That individual was hired as a locksmith in 1994. (See Aff. of Andre Butler, sworn to on Mar. 28, 2005 ("Butler Aff."), ¶ 6).

In his papers, Brown also alleges that Parkchester condoned a racially hostile work environment, citing an incident in which Occhipinti called another African-American SPO a "nigger." (Pl.'s Opp'n Preface (2) ¶ 17). Brown did not personally witness the alleged incident, but learned of it later.[5] (Brown Dep. 71, 73-74). Brown also claims that Occhipinti referred to minority employees as "motherfuckers" "whenever he

[5] Occhipinti denies that this incident ever occurred. (Aff. of Vincent Occhipinti, sworn to on Feb. 10, 2005 ("Occhipinti Aff."), ¶ 6).

was angry about something." (Id. at 74-75). Brown was unable to supply the dates when Occhipinti used either of these two pejorative terms, however. (Id.).

3. Age Discrimination

In support of his age discrimination claim, Brown alleges that an unnamed younger SPO was given a position in the training school without regard to seniority. (Pl.'s Surreply (Age Discrimination) ¶ 6). Brown further alleges that Occhipinti would call him "useless" every time he walked by him, which was "many times" over the course of a month or month and one-half. (Id. ¶ 1; Brown Dep. 77-78). Brown also states that Cowan often would say at roll calls that he was going to hire "young bucks." (Pl.'s Opp'n Material Fact Sheet 2 (Age Discrimination) ¶ 4, Preface (2) ¶ 14). Brown also has submitted evidence indicating that Occhipinti referred to older workers as "useless" at meetings between the Union and Parkchester's management, and that the Union wrote to Parkchester's president to complain about this conduct. (See Aff. of Claude Burley, sworn to on Jan. 6, 2005 ("Burley Aff."), ¶ 1; Pl.'s Opp'n Attach. (Mem. from Burley to Edward Watkins dated Jan. 3, 1996)).[6]

---

[6] In his amended complaint, Brown also alleges that he was the victim of sex discrimination. (Am. Compl. ¶¶ 4, 8). The Court cannot consider this claim because it was neither presented to the EEOC nor reasonably related to the charges that he did set forth in his EEOC charge. See Holowecki v. Fed. Express Corp., __ F.3d __, 2006 WL 555368, at *7 (2d Cir. Mar. 8, 2006) (quoting Francis v. City of New York, 235 F.3d 763, 768 (2d Cir. 2000)) ("[E]xhaustion of administrative remedies through the EEOC [is] 'an essential element of Title VII's statutory scheme.'"); Butts v. City of N.Y. Dep't of Hous. Preservation and Dev., 990 F.2d 1397, 1402 (2d Cir. 1997) (describing three situations in which claims are considered reasonably related).

(continued...)

III. Discussion

A. Summary Judgment

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate only when:

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

In deciding a motion for summary judgment, the court must "view the evidence in the light most favorable to the party against whom summary judgment is sought and . . . draw all permissible inferences in favor of that party." Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir. 1997). The Court also must accept as true the non-moving party's evidence, if supported by affidavits or other evidentiary material. See Kulak v. City of New York, 88 F.3d 63, 70 (2d Cir. 1996). Assessments of credibility, choosing between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court. Fischl, 128 F.3d at 55. See also Fed. R. Civ. P. 56(e) 1963 advisory committee's note. Thus, "[t]he court's function is not to resolve disputed issues

---

[6](...continued)

Brown's amended complaint also alleges "Government [I]nterference" in connection with an EEOC mediation in New York City. (Am. Compl. ¶ 8). His unsworn allegations with respect to this claim, apart from being cryptic, are wholly conclusory, and therefore cannot afford him any basis for relief. (See Pl.'s Opp'n Material Fact Sheet 5 (Fed. Agency Interference) & Conclusion Part B).

of fact but only to determine whether there is a genuine issue of material fact to be tried." Fischl, 128 F.3d at 55.

To defeat a motion for summary judgment, the non-moving party cannot merely rely upon allegations contained in the pleadings that raise no more than "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Rather, the nonmoving party must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

The Second Circuit has cautioned that summary judgment is often inappropriate in cases where the trier of fact will have to delve into an employer's intent, because intent is an issue as to which direct evidence is rarely available. See, e.g., Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994); Patrick v. LeFevre, 745 F.2d 153, 159 (2d Cir. 1984). However, when an employer has explained its conduct and the plaintiff has offered only conclusory assertions in opposition, summary judgment may be granted. See, e.g., Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985) ("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all [discrimination] cases.").

Although the same summary judgment rules apply to a party proceeding pro se, special latitude is appropriate to ensure that a meritorious claim is not foreclosed simply because the papers submitted in opposition to the motion are inartfully worded.

See Morris v. Citibank, N.A., No. 97 Civ. 2127 (JGK), 1998 WL 386175, at *2 (S.D.N.Y. July 8, 1998); see also Estelle v. Gamble, 429 U.S. 97, 106 (1976) (pro se complaint should be held to less stringent standard than formal pleadings drafted by counsel); McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999) (pro se pleadings should be read liberally and interpreted to "raise the strongest arguments that they suggest") (quoting Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994)). By the same token, however, "a pro se party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." Odom v. Keane, No. 95 Civ. 9941 (SS), 1997 WL 576088, at *3 (S.D.N.Y. Sept. 17, 1997) (quoting Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1995)). Accord Jorgensen v. Careers BMG Music Publ'g, No. 01 Civ. 0357 (LAP), 2002 WL 1492123, at *3 (S.D.N.Y. July 11, 2002).

B. Applicable Law

1. Disability Discrimination

The Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. ("ADA"), prohibits discrimination against a "qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a). To establish a prima facie case of disability discrimination, a plaintiff must show that (a) his employer is subject to the ADA; (b) he suffered from (or was regarded as suffering from) a disability within the meaning of the ADA; (c) he could perform the essential functions of his job with or without reasonable accommodation; and (d) he suffered an adverse employment action because of his actual or perceived disability. See Capobianco v. City of New York, 422

F.3d 47, 56 (2d Cir. 2005); Rodal v. Anesthesia Group of Onondaga, P.C., 369 F.3d 113, 118 (2d Cir. 2004); Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Prog. Inc., 198 F.3d 68, 72 (2d Cir. 1999); Moguel v. Covenant House/New York, No. 03 Civ. 3018 (RWS), 2004 WL 2181084, at *10 (S.D.N.Y. Sept. 29, 2004) (quoting Heyman).

The ADA does not define the term "essential functions." Nevertheless, the EEOC, the agency charged with enforcement of the statute, has furnished a definition in its regulations. Those regulations are not binding on the federal courts, but still provide useful guidance concerning the statute's proper interpretation. See Ryan v. Grae & Rybicki, P.C., 135 F.3d 867, 870 (2d Cir. 1998). The regulations define essential functions as "the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n)(1). The regulations also state that a function may be essential "because the reason the position exists is to perform that function." Id. § 1630.2(n)(2)(i). Among the factors to be considered in determining whether a particular job function is essential are:

> (i) The employer's judgment as to which functions are essential;
>
> (ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
>
> (iii) The amount of time spent on the job performing the function;
>
> (iv) The consequences of not requiring the incumbent to perform the function;

(v) The terms of a collective bargaining agreement;

(vi) The work experience of past incumbents in the job; and/or

(vii) The current work experience of incumbents in similar jobs.

Id. § 1630.2(n)(3)(i)-(vii).

The EEOC regulations also address the reasonableness of proposed accommodations. Among other things, the EEOC regulations provide:

> An employer may reassign an individual to a lower graded position if there are no accommodations that would enable the employee to remain in the current position and there are no vacant equivalent positions for which the individual is qualified with or without reasonable accommodation. An employer, however, is not required to maintain the reassigned individual with a disability at the salary of the higher graded position if it does not so maintain reassigned employees who are not disabled.

Connolly v. Bidermann Industries U.S.A., Inc., 56 F. Supp. 2d 360, 365 (S.D.N.Y. 1999) (quoting 29 C.F.R. Pt. 1630 App. § 1630.2(o)).

2. Race and Age Discrimination

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"), provides that it is unlawful for an employer to "discharge an individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

The Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq. ("ADEA"), provides that it is unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employmen, because of such individual's age." 29 U.S.C. § 623(a)(1).

To establish a prima facie case under either Title VII or the ADEA, a plaintiff must show that he (a) was a member of a class protected by the statute; (b) his job performance was satisfactory; (c) he suffered an adverse employment action; and (d) the adverse employment action occurred under circumstances that give rise to an inference of discrimination. See McDonnell Douglas v. Green, 411 U.S. 792, 802 (1973) (Title VII); Farias v. Instructional Sys., Inc., 259 F.3d 91, 98 (2d Cir. 2001) (same); Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 91 (2d Cir. 2001) (ADEA). One way in which an employee can establish that such an inference is warranted is by establishing that his employer "treated him less favorably than a similarly situated employee outside his protected group." Conway v. Microsoft Corp., 414 F. Supp. 2d 450, 459 (S.D.N.Y. 2006) (quoting Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000)) (Title VII); see also Brennan v. Met. Opera Ass'n, 192 F.3d 310, 316 (2d Cir. 1999) (noting that "the same standards govern disparate treatment claims arising under either Title VII or the ADEA"). This is a relatively difficult burden because Brown must show that he was "similarly situated in all material respects to the individuals with whom

he seeks to compare himself." Conway, 414 F. Supp. 2d at 459 (internal quotation marks omitted).

An employee also may suffer discriminatory treatment in violation of Title VII or the ADEA if he is required to work in a hostile or abusive environment. See Gregory v. Daly, 243 F.3d 687, 691 (2d Cir. 2001) (Title VII); Brennan, 192 F.3d at 31 (ADEA). To prevail on this theory, however, Brown must prove (1) that his working environment was "objectively hostile" and (2) that a specific basis exists for imputing the harassing conduct to Parkchester. See Howley v. Town of Stratford, 217 F.3d 141, 153-54 (2d Cir. 2000) (Title VII); Pronin v. Raffi Custom Photo Lab., Inc., 383 F. Supp. 2d 628, 633-34 (S.D.N.Y. 2005) (Title VII and ADEA); O'Dell v. Trans World Entm't Corp., 153 F. Supp. 2d 378, 385 (S.D.N.Y. 2001) (Title VII).

To determine whether a work environment is "objectively hostile," a court must examine all of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993). "[H]arassment is actionable . . . only if it is so severe or pervasive as to alter the conditions of [the victim's] employment and create an abusive working environment." Clark County Sch. Dist. v. Breedon, 532 U.S. 268, 270 (2001) (quoting Faragher v. Boca Raton, 524 U.S. 775, 786 (1998)) (second brackets in original; internal quotations marks deleted). Isolated incidents of harassment, unless "extremely serious," are not sufficient to give rise to a

hostile work environment claim. See Breedon, 532 U.S. at 271; Howley, 217 F.3d at 153-54; O'Dell, 153 F. Supp. 2d at 386. See also Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997) (incidents of harassment must be "more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive").

Although a hostile work environment claim requires a substantial showing, the Second Circuit has cautioned against setting the bar too high. Terry v. Ashcroft, 336 F.3d 128, 148 (2d Cir. 2003). The test is whether

> the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment *altered for the worse*. The environment need not be unendurable or intolerable. Nor must the victim's psychological well-being be damaged. In short, the fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious cases.

Id. (italics in original) (internal quotes and citations omitted).

3. Timeliness of Claim

To bring a claim in federal court under the ADA, ADEA, or Title VII, Brown must first have exhausted his administrative remedies by presenting his complaint to the EEOC. See Carela v. N.Y.C. Parks & Recreation Dep't, No. 98 Civ. 2753 (DAB), 2005 WL 2105546, at *6 (S.D.N.Y. Sept. 1, 2005). Such a charge usually must be filed with the EEOC within 180 days of the discriminatory act; however, in states such as New York, which have their own anti-discrimination agency, the deadline is extended to 300 days. Id. at n.4; see also Lennon v. New York City, 392 F. Supp. 2d 630, 638 (S.D.N.Y.

2005). Acts which occur more than 300 days before the EEOC filing consequently are time barred unless they are part of a continuing unlawful practice which extends into the 300-day look-back period. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 117-18 (2002).

4. McDonnell Douglas Analysis

Claims of disparate treatment under all three anti-discrimination statutes at issue here must be analyzed under the familiar McDonnell Douglas burden-shifting analysis. McDonnell Douglas, 411 U.S. at 802. See Farias, 259 F.3d at 98 (Title VII); James v. New York Racing Ass'n, 233 F.3d 149, 153-54 (2d Cir. 2000) (ADEA); Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 52 (2d Cir. 1998) (ADA). Thus, a plaintiff bears the initial burden of making a prima facie showing of discrimination. McDonnell Douglas, 411 U.S. at 802. As many courts have noted, this initial burden is not a demanding one. See Greenway, 143 F.3d at 52. The prima facie showing, if made, gives rise to a presumption of unlawful discrimination. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 249, 252-54 (1981).

If a plaintiff succeeds in making a prima facie showing, the burden then shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the action taken. McDonnell Douglas, 411 U.S. at 802; see also Farias, 259 F.3d at 154; James, 233 F.3d at 154. Should the defendant carry that limited burden of production, the presumption arising out of the prima facie showing drops out of the case, and the burden then rests with the plaintiff to establish that "discrimination was the real reason for the

employment action." Graham, 230 F.3d at 38. Thus, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Burdine, 450 U.S. at 253.

In its en banc decision in Fisher v. Vassar College, 114 F.3d 1332 (2d Cir. 1997) (en banc), the Second Circuit indicated that an explanation by the employer which is pretextual "is not always sufficient to sustain an ultimate finding of intentional discrimination." Id. at 1338. This holding, however, was called into doubt by the Supreme Court's subsequent decision in Reeves v. Sanderson Plumbing Prods., 530 U.S. 133 (2000). Many commentators read Reeves to overrule Fisher and preclude the granting of summary judgment to an employer in circumstances where the employee could establish both a prima facie case and that the employer's asserted rationale for the adverse employment action was pretextual. See, e.g., Tamara Loomis, 'Pretext Plus' Rejected – Employment Discrimination Landscape Changed, N. Y. L. J. , June 22, 2000, at 5.

In James, the Second Circuit sought to harmonize Fisher with Reeves. As Judge Leval summarized the applicable case law, "once a minimal prima facie case is proved and the employer's nondiscriminatory explanation has been given, the McDonnell Douglas presumptions disappear from the case, and the governing standard is simply whether the evidence, taken as a whole, is sufficient to support a reasonable inference that prohibited discrimination occurred." James, 233 F.3d at 156. This requires a case-by-case analysis of the evidence "to determine whether it reasonably supports an inference of

the facts plaintiff must prove – particularly discrimination." Id. at 157. Stated somewhat differently, the court must "examin[e] the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" Uddin v. New York City, Nos. 99 Civ. 5843 & 00 Civ. 3417 (GEL), 2001 WL 15694, at *3 (S.D.N.Y. Jan. 8, 2001) (quoting Schnabel v. Abramson, 232 F.3d 83, 90 (2d Cir. 2000) (in turn, quoting Reeves, 530 U.S. at 143)). See also Zimmerman v. Associated First Capital Corp., 251 F.3d 376, 382 (2d Cir. 2001) (noting that "[t]he task . . . is to examine the entire record and, in accordance with Reeves, make the case-specific assessment as to whether a finding of discrimination may reasonably be made").

4. Application of Law to Facts

a. Disability Claim

Parkchester does not dispute that it is an employer whose employees are covered by the ADA and that Brown is an individual with a disability within the meaning of the statute. The parties also appear to agree that the essential functions of an SPO include many duties which require considerable physical exertion, such as effecting arrests and subduing those who resist arrest. Finally, Brown seems to agree that he could not have returned to full duty in or around June 1997. What Brown argues instead is that exceptions were made by management in an effort to accommodate Cuccinella, another

SPO who allegedly could not climb stairs or stand for very long, (see Pl.'s Opp'n Preface (2) ¶ 6), and that he should have been accommodated in the same manner.[7]

The parties disagree as to whether Cuccinella was capable of performing all of the duties of an SPO when he was assigned to the fixed post or was simply being shown some kindness because he was of advanced age. Brown contends that Cuccinella could "barely walk" and was given his fixed post in violation of Union seniority rules. (See id. ¶¶ 6, 15, 19; Pl.'s Surreply "Plaintiff was no Longer Qualified for the Position," ¶ 2). Parkchester, on the other hand, has submitted the affidavits of two supervisors, both of whom state that Cuccinella was fully capable of performing the tasks assigned to him, "including walking and climbing stairs." (Bellamy Aff. ¶ 7; Reply Aff. of Dennis Cowan, sworn to on Apr. 14, 2005, ¶ 6). As they further explain, Cuccinella was not assigned a fixed post because he was disabled. Instead, Cuccinella acquired his fixed post in 1992 when Parkchester entered into an agreement with the Union to reassign him there so that it could replace him with a lower-paid "civilian" in his prior position as a dispatcher. (Id.).

There is, of course, substantial reason to question whether Brown was as fit as Cuccinella since his own physician declared only a few months later that he had "a permanent disability of the right knee," was "unable to climb stairs or walk more than one block," and could not "work as a[n SPO] indefinitely" due to his progressive condition.

---

[7] Ironically, Brown himself was assigned to a similar "fixed" post when he returned to work in late 1995 following his double knee replacements. (Brown Dep. 15-16).

(Shalley Affirm. Ex. J). At this preliminary stage, however, the Court's function is not to resolve disputed issues of fact. Accordingly, the Court must assume, as Brown alleges, that he could have performed the essential functions of his job had he been reasonably accommodated.

Nevertheless, Brown's disability discrimination claim fails to meet the fourth prong of a prima facie showing because he has not established any circumstances which warrant an inference of discrimination on the basis of his actual or perceived disability. Indeed, rather than refusing to place Brown in a fixed post position, Parkchester simply sought clarification as to what his limitations were. As part of this effort, and as the CBA permitted, Parkchester asked Brown to submit a doctor's note clarifying the meaning of the terms "light/limited duty" so that it could determine the functions he was able to perform. (Cowan Aff. ¶ 11; Brown Dep. 51, 55, 63, 169). Brown unquestionably was aware of this request by October 1997. Rather than complying, however, Brown chose not to see his physician until January 1998, by which time he had already been terminated. (Brown Dep. 63).

It also is undisputed that even in the absence of a doctor's note, Parkchester was willing to offer Brown a position as a dispatcher, at the dispatcher's rate of pay, in an effort to accommodate him until he was again able to perform the duties of an SPO. (Def.'s R. 56.1 Stmt. ¶ 18; Cowan Aff. ¶ 13). Although Brown testified at his deposition that the Union never relayed that specific offer to him, it was not unreasonable for Parkchester to convey that offer to the Union, rather than directly to him, since the parties

were engaged in a grievance proceeding. In fact, it appears that this is precisely how Cuccinella obtained his fixed-post position at an earlier time. (See Bellamy Aff. ¶ 7).

In short, the undisputed evidence shows that Parkchester had expressed a willingness to accommodate Brown's disability if he could establish his ability to work as an SPO. Additionally, if he was not fit to serve as an SPO, Parkchester was willing to let him work at a job that he could perform at the commensurate rate of pay. Although the precise terms of Parkchester's offer of a dispatcher job may not have been conveyed to Brown by his Union representatives, the fact remains that Parkchester did what it could to provide him with work that was consistent with his apparently extensive limitations. Since Parkchester afforded Brown a full year of disability leave, sought to accommodate him when that period expired, and fired him only after he failed to provide information regarding his medical status that it reasonably had requested, there is no basis on which a jury could reasonably conclude that Parkchester discriminated against Brown on the basis of his disability.[8]

---

[8] Brown also has annexed to his papers, the sworn statement of Leon Heyward, another former SPO, who notes that, unlike Brown, Valerie Acevedo was accommodated around 1998 by being placed in the Parkchester training academy while she was pregnant. (Pl.'s Opp'n Attach. (Stmt. of Leon Heyward, sworn to on Feb. 2, 2005)). Suffice it to say, whatever Brown's physical condition may have been, his situation cannot be described as similar to Acevedo's in all material respects. Acevedo's assignment to the academy therefore cannot give rise to a disparate treatment claim.

b. Race Discrimination Claims

1. Disparate Treatment

Brown also plainly meets two of the four required elements of a prima facie Title VII race discrimination claim since he is an African-American male and suffered an adverse employment action when he was terminated. As the preceding discussion of Brown's ADA claim establishes, there is an issue as to whether Brown was capable of functioning as an SPO when he proposed to return to work in 1997. Nevertheless, Parkchester does not dispute that he was considered a satisfactory employee before he went out on sick leave. Indeed, he had received several commendations for his work. For this reason, I will assume, for present purposes that Brown has also satisfied the third element of a prima facie race discrimination claim by showing that he was a satisfactory employee.

Brown's proof nonetheless fails to satisfy the last required element which is a showing that his termination occurred under circumstances warranting an inference of race discrimination. In this regard, Brown cites four items of proof: (i) that Cuccinella (who is white) was given a fixed post assignment with weekends off; (ii) that a white employee named Loperno was assigned to a position in Parkchester's training school after surreptitiously taping his fellow employees; (iii) that another white employee, who allegedly was Occhipinti's nephew, was given a locksmith job that he wanted; and (iv) that Occhipinti once allegedly called a Black Parkchester employee a "nigger" and at other times referred to Black employees as "motherfuckers." (Pl.'s Opp'n Material Fact

Sheet 1 (Racial Discrimination) ¶¶ 1-3; Brown Dep. 71, 73-75). The first three matters upon which he relies arguably relate to a disparate treatment claim; the fourth, liberally construed, is more relevant to a possible hostile work environment claim.

Turning first to Cuccinella, even if the Court were to assume that Brown and he were subject to similar physical restrictions, Brown has not established, as he must, that their situation was the same in all material respects. For example, there has been no showing that Brown had been working as a dispatcher at the higher SPO rate of pay or that it was necessary to preserve his SPO salary in order to ensure that there would be no labor unrest if a civilian working at a lower rate of pay was given his position. Additionally, although Brown has shown that there were other fixed locations (i.e., other booths) at Parkchester, he has not adduced any proof that any of those locations actually were staffed or that there was a vacancy for an SPO at such a location. In the absence of such proof, Brown cannot show, as he must, that he and Cuccinella were similarly situated and that he was treated disparately.

The differences between Brown and Loperno are even more striking. Brown alleges that Loperno had less seniority than he did, but nevertheless was assigned to the Parkchester training school (in violation of the agreed Union bidding process) as a reward for "taping [his] fellow workers." (See Pl.'s Opp'n Preface (2) ¶ 20 (alleging that Loperno illegally "wire tap[p]e[d] other security workers")). Parkchester denies that it has ever had a security employee named Loperno. (Bellamy Aff. ¶ 8). However, even if the Court were to assume that there was such an employee, it is understandable that

Parkchester would want to remove him from the field for a period of time after he had provided evidence against other Parkchester employees. By comparison, Brown has shown neither that he cooperated in the investigation of other Parkchester employees, nor that the training school had a vacancy in or around July 1997 when he sought to return to work. Without such a showing, the fact that Loperno may have been given a job in the training school does not establish that Brown was the victim of disparate treatment. Indeed, Brown has not even alleged that he sought a position in the training school before his termination.

Finally, Brown alleges that a white relative of Occhipinti named Ruebner was given a job as a locksmith for which he had applied. The resume that he submitted for the position indicates that he was 52 years old at the time, which suggests that he sought to move from serving as an SPO to working as a locksmith in or around 1986. (See Pl.'s Opp'n Attach. (Resume for the Position of Locksmith)). Another document that he has submitted to the Court indicate, however, that Brown may have applied to be a locksmith as late as 1989. (Id. Attachs.). Whichever date is correct, it is undisputed that Parkchester hired Ruebner in 1994, by which time he had approximately five years of prior experience as a locksmith. (Butler Aff. ¶ 6). Since there is no indication that Brown had any experience as a locksmith, Brown has not shown that he and Ruebner were similarly situated. Moreover, even if Brown were able to show that he and Ruebner had comparable skills, the action that he complains of took place many years before he filed

his EEOC complaint and, consequently, cannot be considered in connection with this suit. See Lennon, 392 F. Supp. 2d at 638.

2. Hostile Work Environment

Brown's Title VII hostile work environment claim is based on an incident during which Occhipinti allegedly called an African-American SPO a "nigger" and other instances in which he allegedly referred to minority employees as "motherfuckers." (Pl.'s Opp'n Preface (2) ¶ 17; Brown Dep. 71, 73-75). It is undisputed that Brown was not present when the first of these remarks allegedly was made and only heard about it from others. (See Brown Dep. 71, 73-74). Moreover, when he was asked about the dates when both types of statements were made, Brown testified that he did not know. (Id. at 74-75).

The fact that Occhipinti may once have called someone else a "nigger" outside Brown's presence obviously is not enough to alter the conditions of Brown's work and give rise to an abusive environment. Moreover, even if Occhipinti referred to minority employees as "motherfuckers" in Brown's presence, there has been no showing that Brown had any dealings with Occhipinti after he went out on sick leave in late July 1996. Accordingly, these remarks would have to have been made before then. There also has been no showing that Occhipinti's alleged statements were part of an uninterrupted course of conduct which constituted a continuing violation. See Lennon, 392 F. Supp. 2d at 638. It follows that Brown's racially hostile work environment claim is time barred

since each of the incidents complained of occurred substantially more than 300 days before his EEOC complaint was filed.[9]

c. Age Discrimination

1. Disparate Treatment

Brown was 63-years old when Parkchester terminated his employment on December 23, 1997. (See Am. Compl. ¶ 7). He therefore is clearly a member of the protected class who suffered an adverse employment action. See O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 312 (1996) (stating that the ADEA protects those who are 40 or over). Nevertheless, as noted above, Brown has not presented evidence sufficient to show that he physically was able to perform the duties of an SPO at the time of his discharge.

---

[9] At an earlier stage of this case, Parkchester successfully moved to dismiss the complaint because this action was filed 115 days after Brown received the right to sue letter, rather than complying with the 90-day deadline mandated by 42 U.S.C. § 2000e-5(f)(1). On appeal, the Second Circuit vacated the dismissal and remanded the case for an evidentiary hearing with respect to Brown's claim that a mental impairment attributable to his strokes prevented him from timely compliance. See Brown v. Parkchester South Condominiums, 287 F.3d 58, 61 (2d Cir. 2002). At the hearing, Brown's neuropsychologist testified to his impaired mental state, "including his difficulties with complex activities, . . . [his] slow learning and slowed mental processing speed, and . . . difficulties with mental flexibility and executive functioning." (See Docket No. 25 (Order dated Oct. 24, 2003)). Following the hearing, Judge Pauley, to whom the case had been reassigned, concluded that Brown was entitled to equitable tolling of the 90-day period.

Brown, of course, had his first stroke in 1996. Nevertheless, he does not contend that he suffered from a mental impairment prior to his termination which would entitle him to equitable tolling of the 300-day period to file an EEOC complaint. Moreover, if Brown were sufficiently impaired to be entitled to equitable tolling before his dismissal, he presumably would not have been mentally fit to serve as an SPO, even if he were assigned to a fixed post.

Moreover, even if Brown were shown to have been fit for duty, his only evidence of disparate treatment is that an unidentified younger male allegedly was given a position in the training school without regard to seniority. (Pl.'s Surreply (Age Discrimination) ¶ 6). Here again, Brown has not shown that he and the other employee were similarly situated in all material respects. Additionally, if the individual transferred was Loperno, the incident about which Brown complains occurred more than a decade before he filed the EEOC complaint and consequently cannot be considered in this suit.[10]

For these reasons, Brown has failed to establish a prima facie case of disparate treatment on the basis of age.[11]

2. Hostile Work Environment

Brown's papers also suggest that Parkchester subjected him to a hostile work environment on the basis of his age. (See Pl.'s Opp'n Material Fact Sheet 2 (Age Discrimination); Pl.'s Surreply (Age Discrimination) ¶¶ 1-3). Specifically, Brown alleges that, prior to his termination, Parkchester's general manager, Occhipinti, called him "useless" every time he passed by him over the course of a "month, [or] a month and a half." (Brown Dep. 77-78). While Occhipinti's use of the term "useless" could be

---

10 Brown did not supply the name of the officer involved in this section of his papers. Accordingly, it is unclear if he is referring to Loperno.

11 Brown also points to the treatment of Cuccinella as evidence of age discrimination. (See Pl.'s Surreply (Age Discrimination) ¶ 4). However, it is undisputed that Cuccinella was older than Brown. (See Cowan Aff. ¶ 15). Accordingly, because Brown does not allege that he was denied a fixed-post SPO position because he was too young, the fact that Cuccinella was given such an assignment is not evidence of age discrimination against him.

interpreted in a number of ways, Brown has adduced evidence that Occhipinti specifically used the term "useless" at meetings between the Union and Parkchester management to refer to older workers. (See Burley Aff. ¶ 1). Indeed, in January 1996, Claude Burley, who was then president of the Union, filed a formal complaint with Edward Watkins, the president of the Parkchester South Condominium, regarding such ageist comments by Occhipinti. (See Pl.'s Opp'n Attach. (Mem. from Burley to Watkins dated Jan. 3, 1996)). Brown also alleges that Cowan would continuously state at lineups at the beginning of shifts, that he was going to hire "young bucks." (Pl.'s Opp'n Material Fact Sheet 2 ¶ 4, Preface (2) ¶ 14).

While the comments attributed to Occhipinti and Cowan were no doubt disconcerting, Occhipinti's statements were apparently made over the course of a matter of weeks. Moreover, Cowan's remarks, in perspective, are arguably no more offensive than the hiring practices of many municipal police departments, which impose maximum age limitations on the recruits they will consider. See generally Petrelli v. City of Mount Vernon, 9 F.3d 250 (2d Cir. 1993). The comments also certainly were not physically threatening and have not been shown to be of such intensity and duration as to interfere with Brown's ability to perform his work as an SPO.

In any event, even if the Court were to assume that the statements by Occhipinti and Cowan rose to a level where they altered the conditions of Brown's work environment, Brown conceded at his deposition that Occhipinti's comments all occurred before he went on his last sick leave in mid-1996. (Brown Dep. 77-78). He similarly

testified that Cowan's remarks were made at "lineups" which Brown obviously was no longer attending once he went on sick leave. His age-based hostile work environment claim therefore suffers from the same infirmity as his racially hostile work environment claim because all of the conduct complained of occurred more than 300 days before his EEOC complaint was filed. Accordingly, because there is no allegation of a continuing violation, this claim too is time barred.

IV. Conclusion

For these reasons, Parkchester's motion for summary judgment (Docket Nos. 56) is granted, and the Clerk of the Court is respectfully requested to close the case.

SO ORDERED.

Dated: New York, New York
March 31, 2006

FRANK MAAS
United States Magistrate Judge

Copies to:
Joel Brown [Pro Se]
2836 Route 94
Washingtonville, New York 10992

Margaret M. Shalley, Esq.
Fasulo, Shalley & DiMaggio, LLP
225 Broadway, Suite 715
New York, New York 10007
Fax: (212) 566-8165